Karen LAVALLEY, Plaintiff,

v.

**QUEBECOR WORLD BOOK SERVICES LLC**
**Defendant.**

No. CIV.A. 03–10139–WGY.

United States District Court, D. Massachusetts.

April 30, 2004.

---

David R Ardito, Law Office of David R. Ardito, Attleboro, MA, for Karen LaValley, Plaintiff.

Amy L. Hemenway, Phillip H. McIntyre, Jaeckle, Fleischmann & Mugel, LLP, Buffalo, NY, Joseph H. Reinhardt, The McCabe Group, PC, Boston, MA, Pilar Caballero Schultz, Jackson Lewis Schnitzler & Krupman, Boston, MA, Thomas R. Smith, Jackson Lewis LLP, Boston, MA, for Quebecor World Book Services, LLC, Defendant.

## MEMORANDUM

YOUNG, Chief Judge.

This was an action brought by a former employee alleging that her former employer was liable for negligent infliction of emotional distress and for gender discrimination under Mass. Gen. Laws ch. 151B. Karen LaValley ("LaValley"), a former employee of Quebecor World Book Services LLC ("Quebecor"), alleged that on July 13, 2001, her supervisor at Quebecor, Alan Francoeur ("Francoeur"), yelled at her because her small size made her unable to operate a hydraulic lift at the required speed. She alleged that over the next week, he drove her to resign by isolating her physically from other employees, preventing her from talking with them, finding fault with everything she did, and frequently reprimanding her for conduct in which other employees could engage with impunity. She sued Quebecor in the Massachusetts Superior Court sitting in and for the County of Bristol, and

Quebecor removed to this Court under 28 U.S.C. § 1441, alleging diversity jurisdiction under 28 U.S.C. § 1332.

Quebecor filed a Motion for Summary Judgment [Doc. No. 15] on September 30, 2003, and after a hearing, this court ALLOWED that motion and entered judgment for Quebecor on December 11, 2003 [Doc. No. 26]. Because summary judgment is a disfavored remedy in civil rights cases, the Court now explains its decision in more detail.

## I. INTRODUCTION

### A. Facts

LaValley failed to submit a Rule 56.1 Statement of disputed facts (due by November 17, 2003), or any evidence beyond allegations in her unverified complaint, so the Court essentially had to take Quebecor's version of the facts, where supported by evidence, as true. *See* Fed.R.Civ.P. 56(e); Local R. Civ. P. 56.1; *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996) ("Appellants' failure to provide a separate statement of disputed facts resulted in the district court's taking of Appellees' statement of uncontested facts as admitted.... The district court also properly disregarded Appellant's numerous unsupported factual allegations.").

Quebecor has a "firm policy" of equal employment opportunity ("EEO"), Defendant's Rule 56.1 Statement ¶ 9 [Doc. No. 17] ("56.1 Stmt"), and an annually-updated Policy Against Sexual and Other Unlawful Harassment (PASOUH) (App.Ex. I), *id.* ¶ 11. Quebecor communicates these policies to all employees, discusses them during orientation, and describes them in the Employee Handbook that all employees (including LaValley) receive. *Id.* ¶¶ 11–13. The PASOUH provides a mechanism for employees to bring harassment and discrimination concerns to Quebecor's attention, *id.* ¶ 12, and it both encourages complaints and states that no retaliation will result from complaints, *id.* ¶ 14. The Human Resources Department thoroughly investigates complaints, *id.* ¶ 15, and takes immediate corrective action against unlawful discrimination or harassment, and sometimes against lawful but inappropriate behavior, *id.* ¶ 16. Meetings and training courses emphasize diversity and respect, and supervisors and managers receive more in-depth training than non-supervisory employees. *Id.* ¶ 17. The system worked well for LaValley when, early in her employment, she approached Human Resources Manager Bruce Winn about a situation involving Ray Ouellette, another Quebecor employee. *See id.* ¶ 43. She was "happy" with Wynn's efforts, and she had no further problems with Ouellette. *Id.*

LaValley, who is four feet, eight inches tall, and weighs roughly 92 pounds, *id.* ¶ 3, began working for Quebecor as a temp in June 2000 and was hired as an employee in August 2000, *id.* ¶ 2. She was a utility worker in the Bindery Department from then until her July 23, 2001 resignation, *id.*, and her immediate supervisor was Alan Francoeur ("Francoeur"), who had encouraged her to apply for permanent employment, *id.* ¶¶ 18–19. A utility worker's duties include such "self-explanatory" tasks as "filling cartons with books, labeling, handwork, inspections work, and operating the hydraulic lifts used to move bundles of loose magazine and book pages ('sigs') from skids onto gatherers that feed into the binder." *Id.* ¶ 20. "All utility workers are trained to perform all tasks, and are expected to perform all [assigned tasks]." *Id.* Francoeur would assign each worker tasks at the beginning of each day. *Id.* Roughly half of Quebecor's utility workers were women. *Id.* ¶ 10.

LaValley had difficulty operating the hydraulic lift, suffering soreness as well as

bruises on her arms and legs when assigned to work it. *Id.* ¶ 21. She attributes her difficulties to her height and weight. *Id.* Unlike her coworkers, she could not operate the lift fast enough to keep up with the gatherers. *Id.* ¶ 22.[1] LaValley claims that other female utility workers[2] were exempted from operating the lift after telling Francoeur that they did not want to, but she also identified other female utility workers who did operate the lift.[3] *Id.* ¶ 23.

Jim Houghton assigned LaValley to operate the hydraulic lift for two consecutive weekend overtime shifts in October 2000, her first time performing that task. *Id.* ¶ 24. LaValley had difficulty operating the lift, and two female utility workers who were assigned to hydraulic lifts on the same binder had to help her by feeding bundles onto her gatherers (in other words they were doing the same tasks LaValley was, and in addition were helping LaValley). *Id.* LaValley was asked to operate the lift on two or three other occasions, for roughly one to two hours at a time, to relieve another employee, and on one occasion she voluntarily relieved an employee on the lift. *Id.* ¶ 25.

### 1. The Lift Incident and LaValley's Last Week

On July 13, 2001, a week before LaValley resigned, Francoeur assigned her to operate the lift. *Id.* ¶ 26. Although LaValley typically performed inspections on

handwork, there was no such work for her on that day. *Id.* Approximately two hours into the shift, LaValley complained to Jeff Burnette ("Burnette"), lead binder operator, that she was having difficulty operating the machine, and he conveyed her complaint to Francoeur. *Id.* ¶ 27.[4] Francoeur immediately went to LaValley to ask what the problem was, and she told him she was having difficulty operating the machine and that the job was too hard for her. *Id.* ¶ 28. Francoeur saw that LaValley was operating the machine properly, and he observed other utility workers assigned to operate hydraulic lifts, who were able to keep up with their own work while helping LaValley keep up with hers. *Id.* ¶ 29. Francoeur told LaValley to continue operating the lift, as that was her assigned task for the shift. *Id.* LaValley then began yelling and complaining that it was not safe for her to operate the lift, and she called Burnette a "kindergartner" and told him that he was "acting like a baby." *Id.* ¶ 30.

Francoeur removed LaValley from the lift, assigned her to go out back and wipe down covers, and replaced her on the lift with another female utility worker. *Id.* ¶ 31.[5] LaValley sat by herself after that, because she was upset and wanted to be alone. *Id.* ¶ 40. Although she "felt that" Francoeur's assignment meant that he did not want her to speak to any other employees, Francoeur never told her not to speak to others. *See id.* ¶ 40. As a gener-

---

1. LaValley did not think she could have kept up even if the machine were running slower. 56.1 Stmt ¶ 22.

2. Specifically, the alleged workers were Linda Vincent, Anna Robero, Rhoda Martin, and Harrier Viverous. *Id.* ¶ 23.

3. Specifically, they were Jen Salzillo, Robin Teixeira, Maureen Kelley, Andrea Thompson, and Andrea Webster. *Id.*

4. LaValley's Opposition alleges that her coworkers began making the machine run extra fast "to have some fun with her," Pl.'s Mem. at 1, but obviously there is no evidence of this.

5. LaValley's Opposition alleges, without evidence, that Francoeur responded angrily to her complaints about the lift, and that other employees who complained about working on the lift were not treated in this way. Pl.'s Mem. at 1.

al matter, employees are allowed to talk with one another, as long as talking does not compromise safety or efficiency. *Id.* ¶ 41.

A few days later, Francoeur observed Lia Bush, Hugh McKinnion, and Linda Vincent speaking to LaValley during working hours, and he approached those employees and told them to get back to work. *Id.* ¶ 42. Francoeur called LaValley into his office and told her that she should not leave her work area to talk to others, but no discipline resulted from the meeting. *Id.* ¶ 42.

LaValley was not assigned to operate the lift during her last week of employment. *Id.* ¶ 32. She kept to herself for that week. *Id.* ¶ 40. She had no problems with the assignments she received during her last week of employment, and considered many of them "good." *Id.* ¶ 33. When, before July 13, 2001, she had to operate the lift for short stints as a relief worker, she never complained, and Francoeur was the only manager to whom she ever complained about having to operate it for longer periods. *Id.* ¶ 34.

LaValley's last day of work was July 18, 2001, and on July 23, 2001, she contacted Stephanie McGarry–Shofield ("McGarry–Shofield"), Regional Human Resources Manager, to resign. *Id.* ¶ 35. LaValley refused McGarry–Shofield's request to come in for a meeting at which Burnette and Francoeur would be present. *Id.* ¶ 35. LaValley considered McGarry–Shofield approachable and a "very nice lady," and believed McGarry–Shofield was giving her the benefit of the doubt by offering the meeting. *Id.* ¶ 36. Before July 13, 2001, LaValley also liked Francoeur very much, and had no problems with him. *Id.* ¶ 38.

## B. Procedural Background

Around August 20, 2001, LaValley filed a letter complaint with the Massachusetts Commission Against Discrimination ("MCAD") and with the United States Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on "other." 56.1 Stmt ¶ 44. The MCAD issued a Dismissal and Notification of Rights on September 17, 2002, recommending that LaValley's complaint be dismissed for lack of probable cause. *Id.* ¶ 45. The EEOC issued a Notice of Right To Sue Letter on February 6, 2003. *Id.*

LaValley filed her Complaint[6] ("Compl.") in the Massachusetts Superior Court sitting in and for the County of Bristol on December 16, 2002. Quebecor properly removed the case to this Court[7] under 28 U.S.C. § 1441 on January 21, 2003, properly alleging diversity of citizenship, *see* 28 U.S.C. § 1332 (LaValley is a resident of Taunton, Massachusetts, Compl. ¶ 1, and Quebecor is incorporated and has its principal place of business in Delaware, Notice of Removal ¶ 3 [Doc. No. 1]). The Notice of Removal alleges that the amount in controversy exceeds $75,000, Notice of Removal ¶ 3, and it does not "appear to a legal certainty that the claim is really for less than [$75,000]," *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

Non-expert discovery closed on August 15, 2003, and Quebecor filed its Motion for Summary Judgment [Doc. No. 15] on September 30, 2003, along with supporting Memorandum [Doc. No. 16] ("Def.'s Mem."), Rule 56.1 Statement, and Document Appendix [Doc. No. 18] ("App."). LaValley filed her Motion in Opposition [Doc. No. 22] on November 10, 2003, along

---

6. The Complaint is in the State Court Record [Doc. No. 2].

7. Notice of Removal [Doc. No. 1].

with a supporting Memorandum [Doc. No. 23] ("Pl.'s Mem."). Quebecor filed a Reply Memorandum [Doc. No. 25] on November 26, 2003 ("Def.'s Rep.").

## II. DISCUSSION

### A. Effect of LaValley's Failure To Submit a Rule 56.1 Statement

■ As the Court has already stated, LaValley's failure to submit a Rule 56.1 Statement has led the Court to accept as true Quebecor's version of the facts, where described in Quebecor's Rule 56.1 Statement and supported by record evidence. Admittedly, courts should hesitate to permit a default by a civil rights plaintiff's attorney to affect such a plaintiff's case adversely. In this case, however, the Court gave LaValley's attorney ample opportunity to comply with Rule 56.1's requirements, granting LaValley's Motion To Continue Hearing [Doc. No. 19] and her Motion for Extension of Time [Doc. No. 20], which sought additional time to respond to Quebecor's Motion for Summary Judgment. At the summary judgment hearing, LaValley's attorney stated that he would prefer to have additional time to file a Rule 56.1 Statement, but agreed to argue based on the facts in Quebecor's Rule 56.1 Statement.

■ Although courts should avoid unduly harsh enforcement of procedural rules, particularly when such enforcement materially prejudices a party's case, they should not go so far in relaxing or bending those rules that they prejudice the other party. In the case of Rule 56.1, moreover, it may sometimes happen that a party who has an exceptionally weak case, and who has not managed to reach a settlement agreement with the opposing party by the summary judgment stage, does not wish to expend the resources necessary to prepare a Rule 56.1 Statement. The Rule permits courts to dispose of weak cases when one party, while unwilling to waste resources on preparing a Rule 56.1 Statement, is also unwilling to settle or to withdraw the case. The Court could scarcely know what motivated LaValley and her attorney to offer so little resistance to Quebecor's Motion for Summary Judgment, but the Court's independent review of LaValley's deposition and of other record evidence revealed that this was indeed an exceptionally weak case, and that LaValley almost certainly could not have changed the case's disposition by filing a Rule 56.1 Statement.

### B. Summary Judgment Standard

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain. Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" issue of fact is one that a reasonable jury, on the record before the Court, could resolve in favor of either party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In making its determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 490, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

The moving party bears the burden of showing that no genuine issue of material fact exists and that said party is entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant presents evidence to that effect, the burden then shifts to the nonmovant to proffer evidence supporting the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The adverse party may not rest upon mere

allegations or denials; she must set forth specific facts showing that a genuine issue exists. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. If the movant demonstrates that the nonmovant has failed to prove an essential element of a claim on which the nonmovant bears the burden of proof, the Court must award the movant summary judgment on that claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## C. LaValley Cannot Establish Disparate Treatment

■ Although summary judgment "is a disfavored remedy" in disparate treatment cases under Chapter 151B, it "is not always inappropriate," and is particularly appropriate where, as here, "the plaintiff's evidence of intent, motive, or state of mind is insufficient to support a judgment in the plaintiff's favor." *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 439, 646 N.E.2d 111 (1995). Because the *Blare* court singles out only one class of cases as generally inappropriate for summary judgment, the Court treats this pronouncement as a substantive interpretation of Chapter 151B, rather than as an interpretation of Massachusetts civil procedural law inapplicable in this Court. The Court's treatment of this question does not impact the case's result.

### 1. The Order of Proof

■■ In evaluating Chapter 151B disparate treatment claims where there is no direct evidence of discrimination, the Massachusetts Supreme Judicial Court follows a three-stage order of proof similar to the one set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for similar cases under the anti-discrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–7 ("Title VII"). *Blare,* 419 Mass. at 440–41, 646 N.E.2d 111

(citing *Wheelock College v. Massachusetts Comm'n Against Discrimination,* 371 Mass. 130, 134–36, 355 N.E.2d 309 (1976)). In interpreting ch. 151B, however, the Massachusetts courts are not bound by federal interpretations of Title VII. *Id.* at 441, 646 N.E.2d 111 (citing *College–Town Div. of Interco., Inc. v. Massachusetts Comm'n Against Discrimination,* 400 Mass. 156, 163, 508 N.E.2d 587 (1987)).

■ In the first stage, the plaintiff must, by a preponderance of the evidence, establish a *prima facie* case (and thus a presumption) of discrimination. *Blare,* 419 Mass. at 441, 646 N.E.2d 111; *see McDonnell Douglas,* 411 U.S. at 802. In *Blare* itself, the elements of the *prima facie* case were: "(1) [the employee] is a member of a class protected by [Chapter 151B]; (2) he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's." 419 Mass. at 441, 646 N.E.2d 111.

■ In the second stage, the defendant can rebut the presumption of discrimination by "articulating a legitimate, nondiscriminatory reason" for its action and by "produc[ing] credible evidence to show that the reason or reasons advanced were the real ones." *Blare,* 419 Mass. at 441–42, 646 N.E.2d 111 (citations and internal quotation marks omitted). The defendant's burden of production here "is not onerous." *Id.* at 442, 646 N.E.2d 111.

■ In the third stage, if the defendant has produced evidence of a legitimate nondiscriminatory reason for the action,

the bubble of the presumption that stems from proof [of] the basic fact[s] bursts and the law of presumption drops out of the case, to be replaced by a possible inference of discrimination should the fact finder find the reason

advanced by the defendant to be pretextual. While the employer['s] legitimate, nondiscriminatory reason for an adverse employment decision destroys the presumption of discrimination that arises [from] proof of the basic facts in a discrimination case, evidence that the proffered reason may be pretextual, coupled with such basic facts, permits an inference of discrimination.

Against a defendant's motion for summary judgment, the presiding judge will draw this and all other reasonable inferences in favor of the plaintiff. Still, the plaintiff's state and federal cause of action will fall to the summary judgment axe unless, on the entire record, there is something more than speculation that the pretextual reason advanced by the defendant is actually a cover for prohibited discrimination.

William G. Young, John R. Pollets & Christopher Poreda, *Evidence*, 19 *Mass. Practice* § 301.12, at 31 (2003 Supp.) (footnote omitted) (citing *Abramian v. President and Fellows of Harvard College*, 432 Mass. 107, 115–19, 731 N.E.2d 1075 (2000), and *Fite v. Digital Equip. Corp.*, 232 F.3d 3 (1st Cir.2000)).

a. **The *Prima Facie* Case**

■ Quebecor asked the Court to use the *prima facie* case elements from *Blare* itself, *see* Def.'s Mem. at 2, but in fact "the essential elements of a prima facie case necessarily vary depending on the job involved and the decision to be made." *Smith College v. Massachusetts Comm'n Against Discrimination*, 376 Mass. 221, 230, 380 N.E.2d 121 (1978); *Wheelock*, 371 Mass. at 135 n. 5, 355 N.E.2d 309. Most of the reported cases in Massachusetts deal with unlawful discharges or failures to hire, and therefore tend to include in the *prima facie* case elements that would not apply here.

■ Based on the most relevant precedents, this Court characterizes the elements that LaValley must prove to make her *prima facie* case as follows: (1) she is a member of a protected class; (2) met her employer's legitimate job expectations; and (3) suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *See Sch. Comm. of Braintree v. Massachusetts Comm'n Against Discrimination*, 377 Mass. 424, 430, 386 N.E.2d 1251 (1979) (holding that teachers established their *prima facie* case by showing that they had been denied use of accumulated sick leave for disabilities caused by pregnancy); *Boston v. Massachusetts Comm'n Against Discrimination*, 47 Mass.App.Ct. 816, 821, 717 N.E.2d 259 (1999) ("[T]he plaintiff first shows that he or she is in the protected class and is qualified to perform the task at issue, but was nonetheless subjected to an *adverse employment action*." (emphasis added)); *Freire v. First National*, No. 9646201, 1998 WL 1181751, at *5 (Mass.Super. July 22, 1998) (holding that to establish a *prima facie* case, plaintiff had to "demonstrate that she is a member of a [protected] class ..., that she was qualified for [a position], and that she was rejected for the position *under circumstances giving rise to an inference of unlawful discrimination* " (emphasis added)). An example of "circumstances" sufficient for the third prong would be a failure by her employer to mete out such adverse employment actions in a gender-neutral way. *Cf. Tuccelli v. Bull HN Information Systems*, 1 Mass. L. Rptr. 529, 1994 WL 879602, at *3 (Mass.Super.1994) (Cratsley, J.) (citing as elements for an age discrimination case proof that the plaintiff (1) belonged to a protected class, (2) *"met his employer's legitimate job performance expectations,"* (3) *"experienced an adverse employment action,"* and (4) *"the employer did not treat age neutrally* or that younger

persons were retained in the same position" (emphasis added)); *Mateza v. Polaroid Corp.*, No. 76–3379, 1981 WL 11479, at *62 (Mass.Super. July 30, 1981) (Murphy, J.) (stating that a plaintiff can make out a *prima facie* case for gender-based disparate treatment in pay if she "show[s] that she is paid less than a man for doing substantially similar work, . . . or that she is doing similar work for substantially different pay").

The Court has found similar formulations in federal cases, which constitute persuasive authority in applying Chapter 151B. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (stating that "[t]he central focus of the inquiry . . . is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin" (alteration in original) (citation and internal quotation marks omitted)); *Thomas v. Digital Equipment Corp.*, 880 F.2d 1486, 1490 (1989) (requiring a plaintiff to show "that he was: (1) a member of a protected group; (2) subjected to actions not taken with respect to other managers; (3) while performing his job capably"); *Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir.1997) (holding that a jury could have found that female police officers had made their *prima facie* case by demonstrating that they received harsher treatment in respect to suspensions than "similarly situated" male officers); *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995) (articulating the same formulation of the age discrimination *prima facie* case as in the Massachusetts case, *Tuccelli*, 1994 WL 879602, at *3).

### (1) LaValley Is Within a Protected Class

 Quebecor urged that "LaValley has not alleged that she is a member of a

protected class," Def.'s Mem. at 3, but the Court reasonably construed her complaint and subsequent filings as alleging sex discrimination, and Quebecor made its arguments on the understanding that LaValley was alleging sex discrimination (in addition to discrimination on the basis of disability). LaValley's attorney clarified at oral argument that the claim was one of sex discrimination, and to the extent that LaValley was alleging disability-based discrimination, "normal deviations in height, weight, or strength" do not constitute "impairments" that would place a person in the protected class under Chapter 151B. Massachusetts Commission Against Discrimination, Guidelines: Employment Discrimination on the Basis of Handicap (defining "impairment"). Sex discrimination is thus the only possible claim here.

### (2) LaValley Met Quebecor's Legitimate Job Expectations

 Quebecor argued that LaValley was not qualified (or to translate into the recommended formulation, "meeting Quebecor's legitimate job expectations"), but this claim could not be resolved at the summary judgment stage. Admittedly, utility workers were expected to perform all tasks, and unlike other employees, LaValley had difficulty operating the hydraulic lift and keeping up with the work she had to perform with it. At the same time, there was some evidence that utility workers were disproportionately assigned to tasks which they preferred or at which they excelled. Moreover, in a year or so of employment, LaValley was almost never asked to operate the hydraulic lift, and when she was, she was either not on her regular shift (working overtime), relieving another worker, or finding a substitute task when work of the sort to which she was typically assigned was lacking. This suggests an understanding that Quebecor's utility workers would or could spe-

cialize to some degree, and the lack of other incidents suggests the possibility that LaValley's work was satisfactory overall. Francoeur encouraged her to apply for employment after seeing her at work, and McGarry–Shofield tried to convince her not to quit, both suggesting that LaValley was a qualified utility worker.

### (3) LaValley Did Not Suffer an Adverse Employment Action Under Circumstances That Suggest Discrimination

■ It was the third prong where LaValley failed to make her *prima facie* case, because she provided no evidence that she suffered an adverse employment action or that such action was imposed for discriminatory reasons. She alleged in her Opposition (and upon examination, in her deposition) that after the July 13, 2001, incident, Francoeur "began treating her differently, always reprimanding her." Pl.'s Mem. at 2. In particular, he

would seek her out to make sure that she was not talking during work hours, even though there were no company policies that said she could not talk and all of the other employees would carry on conversations amongst each other without reprimand; however, at one point, [Francoeur] began to reprimand all of the employees that he found having conversations with [LaValley], singling her out and trying to keep her co-workers from speaking with her.

*Id.*[8] Although there are more detailed allegations in the Complaint, *see* Compl. ¶¶ 7–16, LaValley provided no evidence for any of them.[9]

The available candidates for adverse employment action were: (1) relegation to a task in an isolated work space, (2) isolation (physical and social) from co-workers, (3) excessive reprimands, and (4) creation of an environment sufficiently hostile to produce constructive discharge. Unsurprisingly, Quebecor's version of the facts, which this Court basically had to treat as true (although it drew all reasonable inferences therefrom in LaValley's favor), did

---

**8.** LaValley went on to say that "this harassment and hostile environment ... reached a peak when [Francoeur] ordered [LaValley] to work in an area by herself." Pl.'s Mem. at 2. She called this act itself "disparate treatment," and alleged that "[t]he screaming and the bullying by the supervisor towards the Plaintiff became so intolerable she felt forced to leave her job, creating a constructive termination." *Id.*

LaValley seemed to suggest that sexual harassment was involved, although she never actually argued as much, nor could she have on this record. To the extent LaValley was making a claim for constructive discharge, that sentence (in the "Facts" section) was basically the only mention of it. *But cf.* Compl. ¶ 16 ("[LaValley] was harassed until she left the job").

**9.** LaValley alleged the following: after the July 13, 2001, hydraulic lift incident, Francoeur yelled at her (while she was crying) and told her to "either do the job or walk,"

Compl. ¶ 7; from then on she "was forced to work alone and not to talk to anyone," whereas no one else was treated this way, *id.* ¶ 9; on July 16, 2001, anyone who talked to or associated with her was reprimanded, *id.* ¶ 10; on July 17, 2001, Francoeur yelled at her for talking to someone when she left the ladies' room, *id.* ¶ 11; on July 18, 2001, Francoeur "began a series [sic] of harassment that lasted until July 23, 2001," forbidding her from talking to others during work hours, even though other employees could talk to each other, *id.* ¶ 13; on July 19, 2001, Francoeur isolated her at the far end of the building, and chased away a coworker who tried to talk to her during break, *id.* ¶ 13; Francoeur "purposely found fault in everything that [she] did at work and disciplined her when others would not be disciplined for these mistakes," *id.* ¶ 14; from July 13, 2001, through July 23, 2001, she was forced to work alone at the far end of the building, unable to speak with coworkers, who all worked together and were able to speak to one another, *id.* ¶ 15.

not suggest that any of the first three occurred, and in this case the fourth could only have occurred if at least one of the first three had. Thus, the Court here had to rule that no adverse employment action had occurred.

■ Even had the Court assumed that one or more of the first three actions occurred, it is likely that none of them rose to the level of adverse employment action. Under Massachusetts law, "subjective feelings of disappointment and disillusionment," without "objective evidence that [a plaintiff] had been disadvantaged in respect to salary, grade, or other objective terms of employment," are insufficient to establish that an "adverse employment action" has occurred. *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 663, 672 N.E.2d 1 (1996); *see Bain v. City of Springfield*, 424 Mass. 758, 766, 678 N.E.2d 155 (1997) (characterizing allegations that the mayor acted "coldly" toward plaintiff and that her superior was "second-guessing" her excessively were "the kind of subjective and intangible impressions that must not be considered in making out a [Chapter 151B] case"); *MacCormack*, 423 Mass. at 662, 672 N.E.2d 1 (approving of a jury instruction that required "material disadvantage[ ]").

Massachusetts law resembles federal law in this area, and federal cases suggest that neither Francoeur's alleged yelling, reprimands, and interference in LaValley's conversations, nor LaValley's placement at the building's far end, doing tasks that were already within her job description (and some or most of which she actually liked), constituted an adverse employment action. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993)) (stating that "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities," although "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices" might suffice). *But see Howcroft v. City of Peabody*, 51 Mass.App. Ct. 573, 584 n. 16, 747 N.E.2d 729 (2001) (citing with approval the holding in *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.1994), that a qualitative reduction in job responsibilities may constitute adverse employment action). Quebecor properly cited federal cases where changes in job location were not actionable. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (transfer to purportedly inferior facility); *Spriggs v. Pub. Serv. Comm'n of Maryland*, 197 F.Supp.2d 388, 393 (D.Md.2002) (placement in offices plaintiff considered "objectionable").

Of course, there exists a reasonable argument that the several actions, none of which might individually constitute "adverse employment actions," could in combination add up to an "adverse employment action." Even if any of the actions, individually or in concert, rose to the level of adverse employment action, however, LaValley provided no evidence to suggest discrimination.

Usually, the *prima facie* case involves some objective element in this area—finding a similarly situated individual outside the protected class who did not suffer an adverse employment action, for example. Here, LaValley stated that she was singled out for this treatment, and that no other employees, male or female, received such treatment. There did not appear to be any similarly situated individuals—no one else had trouble operating the lift or sought to stop working it once assigned to it (other than to be relieved). There was also nothing in Francoeur's statements to suggest gender bias. LaValley

suggested that the alleged retaliation was based on her diminutive size, but that is not necessarily an inherently gender-based characteristic. There were apparently no other women at Quebecor (among the 50% of utility workers who are female) who had difficulty operating the hydraulic lifts, although the requests of some women (including LaValley) that they not be assigned that task seem to have been honored.

### b. Francoeur's Actions Had a Legitimate Motive

■ A defendant's burden of production in proffering a legitimate motivation for adverse employment actions "is not onerous." *Blare*, 419 Mass. at 442, 646 N.E.2d 111. Thus, even if LaValley could have made out her *prima facie* case, Quebecor provided sufficient evidence of legitimate motives for actions that Francoeur took. He assigned her to wipe down covers after she insisted on not working the hydraulic lift, in acknowledgment of her concerns and out of solicitude for her safety. Her usual tasks were not available on that day—that was why he assigned her to the lift in the first place. Although Quebecor did not allege that the worker who took over for her was wiping covers before, there is no evidence that other workers besides LaValley were available to take on the task, nor is there evidence

that Francoeur assigned her to an unnecessary task in order to isolate her.

Similarly, to the extent that Francoeur interfered with conversations between LaValley and other employees, the available evidence suggests that he did so in a manner consistent with Quebecor's policy allowing conversations only when they take place within workers' assigned areas and do not interfere with work.

All of this took place against the background of strong anti-discrimination policies, which had in fact worked for LaValley in the past but which she chose not to invoke on this occasion.

### c. LaValley Cannot Demonstrate Pretext

Although Quebecor overstated its case in suggesting that LaValley had to identify "another individual similarly situated, and the specific instances in which that ... person was treated differently," Def.'s Mem. at 8 (quoting out of context *Davis v. Jenny Craig, Inc.*, No. 95–4704–E, 1998 WL 1181152, at *10 (Mass.Super.Nov.30, 1998) (Botsford, J.)) (internal quotation marks omitted), she did need to provide some kind of objective evidence of pretext, and this she failed to do.[10]

In the absence of any supporting evidence, the Court could not credit LaValley's allegations that Francoeur yelled at her and called her "spoiled," a "baby," and

---

**10.** Although evidence comparing treatment of similarly situated employees or demonstrating a consistent policy toward employees within a protected class is often necessary for a plaintiff to prevail, *see, e.g., Lewis v. Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761, 767, 493 N.E.2d 867 (1986) (listing these types of evidence, along with treatment of the plaintiff, as included within the classes of possibly relevant evidence), the Massachusetts courts do not appear ever to have squarely said that such evidence is *required*. Indeed, requiring such evidence would transform Massachusetts into a "pretext plus" state.

Moreover, Quebecor's cited federal cases tend to deal more with standards for considering evidence of disparate treatment of allegedly similarly situated individuals than with the necessity for such evidence. For example, Quebecor cites *Conward v. Cambridge School Committee*, 171 F.3d 12, 20 (1st Cir. 1999), to suggest that summary judgment must be awarded if no such evidence is presented. However, that case merely states that, if a plaintiff wishes to rely on such evidence, the juxtaposed situations must resemble one another sufficiently closely. *See id.* at 22.

a "complainer," but even if it could, "isolated or ambiguous remarks, tending to suggest animus based on [gender], are insufficient, standing alone, to prove an employer's discriminatory intent" (or pretext). *Fontaine v. Ebtec Corp.*, 415 Mass. 309, 314 n. 7, 613 N.E.2d 881 (1993). Even if Francoeur's statements could reasonably have been considered gender-related, there was little else to suggest gender bias. Moreover, his comments, if any, were made during the course of a heated argument between him and LaValley, who was yelling at him. Francoeur sometimes yelled at other employees, including men, and LaValley, who until July 13, 2001, liked Francoeur, apparently saw no sexism in his behavior before that date.

Similarly, if Francoeur's actions actually imposed any isolation on LaValley, there was no evidence that his work assignments or reprimands were pretextual. LaValley alleged differential treatment, but did not even specifically identify individuals who received better treatment than she did (beyond "everyone"). Although it was not absolutely necessary for her to bring forth similarly situated individuals for comparison, she had to put forth some evidence beyond subjective impressions.

Thus, because LaValley failed to meet her burden under Chapter 151B, the Court awarded summary judgment to Quebecor on the sex discrimination claim.

### D. LaValley's Tort Claim Is Barred

 The Court also awarded summary judgment on the negligent infliction of emotional distress claim, because the exclusivity provisions of the Massachusetts Workers' Compensation Act, Mass. Gen. Laws ch. 152, § 24 ("MWCA"), bar common law actions like this one. In particular, common law actions are barred where: "the plaintiff is shown to be an employee; his condition is shown to be a 'personal injury' within the [MWCA's meaning]; and the injury is shown to have arisen 'out of and in the course of ... employment.'" *Foley v. Polaroid Corp.*, 381 Mass. 545, 548–49, 413 N.E.2d 711 (1980) (quoting Mass. Gen. Laws ch. 152, § 26); *see Doe v. Purity Supreme Inc.*, 422 Mass. 563, 565–66, 664 N.E.2d 815 (1996) (citing *Green v. Wyman–Gordon Co.*, 422 Mass. 551, 559, 664 N.E.2d 808 (1996)) (affirming dismissal of negligent infliction of emotion distress claims arising out of alleged workplace rape and sexual assault, because MWCA provided the exclusive remedy for physical and emotional injuries resulting from sexual harassment). *Accord Kuczun v. McCue Corp.*, No. ESCV200201127, 2003 WL 21958617, at *4 (Mass.Super.Aug.4, 2003) (Agnes, Jr., J.); *Clemmer v. Cullinane*, No. 013460, 2002 WL 1923868, at *4 (Mass.Super. May 6, 2002) (Kern, J.).

LaValley was obviously an employee, and claims for negligent infliction of emotional distress are covered by the MWCA, *Green*, 422 Mass. at 559, 664 N.E.2d 808. Any emotional or physical injury arose out of and in the course of employment, as it resulted from actions taken by her supervisor [Francoeur] while she was working. *See Doe*, 422 Mass. at 566, 664 N.E.2d 815 (quoting *Caswell's Case*, 305 Mass. 500, 502, 26 N.E.2d 328 (1940)) ("An injury arises out of the employment if it arises out of the nature, conditions, obligations, or incidents of the employment; in other words, out of the employment looked at in any of its aspects.").

### E. LaValley Cannot Invoke Title VII

 LaValley had not invoked Title VII as of the December 10, 2003 hearing on Quebecor's Motion for Summary Judgment, and at that point could not, because a Title VII claim was time-barred. She had 90 days after her February 6, 2003 receipt of a right-to-sue letter from the

EEOC to bring a Title VII suit against Quebecor. *See* 42 U.S.C. § 2000e–5(f); *Chico–Velez v. Roche Prods., Inc.,* 139 F.3d 56, 58 (1st Cir.1998). Her complaint alleged no Title VII claim, and almost ten months have passed since she received her right-to-sue letter. There were no grounds for equitable tolling, as LaValley received adequate notice from the EEOC and was represented by counsel throughout administrative and judicial proceedings. Obviously, Quebecor was not guilty of lulling LaValley into inaction with her Title VII claims, *see Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (citing such actions as possible grounds for equitable tolling, and listing other possible grounds).

### III. CONCLUSION

Accordingly, for the reasons stated above, Quebecor's Motion for Summary Judgment [Doc. No. 15] was ALLOWED, and judgment was entered for Quebecor.