**Carlos PARRA, Plaintiff**

v.

**FOUR SEASONS HOTEL, Defendant.**

**Civil Action No. 05cv12354–NG.**

United States District Court,
D. Massachusetts.

March 23, 2009.

James P. Keane, Thomas W. Duffey, Keane, Klein & Duffey, Boston, MA, for Plaintiff.

Anthony M. Moccia, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, John R. Hunt, Shea, Stokes & Carter ALC, College Park, GA, for Defendant.

## JUDGMENT

GERTNER, District Judge.

For the reasons set forth in the accompanying Memorandum and Order, the defendant's Motion for Summary Judgment (document # 41) is **GRANTED** in its entirety. Plaintiff's Motion for Summary Judgment (document # 37) is **DENIED**. The Court determines that the defendant is entitled to judgment as a matter of law. The Four Seasons Hotel has provided a legitimate, nondiscriminatory basis for the plaintiff's termination, while the plaintiff has not offered sufficient evidence tending to show pretext. Accordingly, the defendant is entitled to judgment on plaintiff's discrimination and retaliation claims under Title VII, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 *et seq.*, and Mass. Gen. L. ch. 151B. Finally, because the plaintiff has offered no evidence of a compensable economic loss related to work he performed prior to termination, his pendent state law claim for breach of the implied covenant of good faith and fair dealing is also foreclosed.

Judgment for the defendant.

**SO ORDERED.**

*MEMORANDUM AND ORDER RE:*
*MOTIONS FOR SUMMARY*
*JUDGMENT*

## I. INTRODUCTION

This lawsuit is one for workplace discrimination based on age, race, and national origin, with pendent state law claims of bad faith termination, infliction of emotional distress, and violation of the implied covenant of good faith and fair-dealing. At the time of his termination in 2004, Carlos Parra, the plaintiff, was a room-service waiter with nearly 20 years of experience working for The Four Seasons Hotel ("the Hotel"). He has alleged that he was fired because of his race, color, national origin, or age following a poor review of the Hotel by an American Automobile Association ("AAA") inspector in 2003. Second Am. Compl. at 5 (document # 18). The Hotel contends that it terminated Parra for disciplinary reasons related to his job performance, following a series of conflicts between the plaintiff and Hotel management. Both Parra and the Hotel have Motions for Summary Judgment presently pending before the Court.

As detailed below, the events culminating in Parra's dismissal do not permit an inference of discrimination; they suggest instead an escalating interpersonal conflict with Hotel management, quite possibly driven by mistrust and animosity between Parra and one or more of his supervisors.

Reports of uncooperativeness, resistance, and rudeness in the face of criticism that immediately preceded Parra's termination—and resulted in his multiple suspensions—are consistent with personnel evaluations and job performance notices that long pre-date the AAA inspection. Together, they supply a clear, non-discriminatory basis for Parra's dismissal. While the AAA incident may have ballooned far beyond all reasonable proportion, fed by ill will and miscues on both sides, no evidence suggests that Parra's treatment was driven by animosity toward a protected class. However unfortunate or misguided, this series of events does not support a discrimination claim under Title VII, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, or Mass. Gen. L. ch. 151B. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979) ("While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.... [The] focus is to be on the employer's motivation, ... not on its business judgment."). The Court does not express an opinion on the Hotel's personnel decisions in this case; it simply finds that there has been no plausible showing that the defendant's explanation is a pretext for discrimination based on Parra's race or age.

Because the Court finds that Parra has not presented sufficient facts to support an inference of pretext or discrimination, the defendant's Motion for Summary Judgment (document # 41) is **GRANTED.** Plaintiff's Motion for Summary Judgment (document # 37) is **DENIED.**

## II. FACTS

Mr. Parra, age 61, first began working for the Four Seasons Hotels in Houston,

Texas in 1985, shortly after he moved to the United States from Mexico in 1982. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶¶ 1–2 (document # 44–3); Def.'s Stat. of Material Facts ¶¶ 1–2 (document # 41–3). In 1987, Parra was transferred to the Boston Four Seasons Hotel, where he worked as a room-service waiter until his termination on April 28, 2004. *Id.* at ¶ 4; Def.'s Stat. of Material Facts ¶ 4 (document # 41–3).

## A. The AAA Inspection

By all indications, the pivotal event in this lawsuit was a AAA inspection of The Four Seasons that took place on July 24, 2003, and resulted in a poor review for the Hotel. The AAA inspector rated the Hotel particularly poorly in the area of room-service delivery, attributing her low rating to the room-service waiter's failure to address the inspector by name, his "mumbled greeting," his interest in watching what she had on television in her room rather than serving her, his failure to ask her where she wanted her table set up, his failure to offer to pour her beverage, and his failure to present her with the newspaper that was hanging in her room. AAA Lodging Evaluation Summary (document # 44–38). Although no documentary evidence appears in the record, according to the Hotel both then and now, the AAA inspector later identified Parra as the waiter who had served her. Def.'s Stat. of Material Facts ¶ 27 (document # 41–3); Kennel Dep. 12:1–14 (document # 44–6). As a result of the negative review, the Food and Beverage Director, Ranier Stampfer, as well as the Room Service Manager, John Gomes, called Parra into a meeting on August 1, 2003, to discuss the service he allegedly provided to the AAA inspector. *Id.*; Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 27 (document # 44–3). From this point, the parties' accounts of relevant events part company.

## B. Disciplinary Actions

The Four Seasons states that Parra initially denied that he was the waiter who served the AAA inspector, but that later in the meeting he admitted he had served her. Def.'s Stat. of Material Facts ¶ 27; Decl. of Ranier Stampfer ¶ 7 (document # 42–9). Parra, however, claims that he denied being the server in question throughout the course of this meeting and consistently thereafter. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 27. Parra further alleges that he asked to see the paperwork indicating that he was the server, but that this request was refused. *Id.* At the conclusion of this meeting, Parra was given a written warning for carelessness based on the AAA inspection. Def.'s Stat. of Material Facts ¶ 27. Parra claims that Mr. Stampfer further told him that this warning would effectively end the matter, which the Hotel denies. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 27; Def.'s Stat. of Material Facts ¶ 27.

After the Hotel received the formal AAA report, another meeting was scheduled with Parra, the Hotel Manager, Thierry Kennel, Mr. Stampfer, and Mr. Gomes to review the report. *Id.* at ¶ 28; Pl.'s Resp. to Def.'s of Material Facts ¶ 28. At this meeting, Mr. Kennel contends that Parra behaved in a rude and insubordinate manner. *Id.* Mr. Kennel stated in his deposition that Parra was "very discourteous, very uncooperative ... didn't care to look at me, gave some very rude sort of facial expression and hand movements ... that I read almost as disgust." Kennel Dep. 12:19–23 (document # 44–6). Mr. Kennel further testified that Parra did not "form one sentence during that meeting" and mostly "wav[ed] his hand [during the meeting] ... [to say] no, no, no.... I don't know, not me." *Id.* at 15:12–19. As a result, Mr. Kennel suspended Parra for

five days and documented this suspension in a disciplinary action form. Def.'s Stat. of Material Facts ¶ 28.

Parra disputes this account and instead claims that he was issued a five-day suspension after he refused to admit that he was the waiter who served the AAA inspector. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 28. Additionally, Parra alleges that he again requested to see the AAA report at this meeting, but that this request was denied by Mr. Kennel. Parra Dep. at 26 (document # 44–4); Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 28.

On August 22, 2008, during his five-day suspension, Parra submitted a letter to Ms. Eldemery, the Director of Human Resources, claiming discrimination based on the manner in which he was treated following the AAA inspection. Parra Letter 8/22/03 (document # 44–31). Notably, Parra did not deny in this roughly contemporaneous letter that he had been the room-service waiter who served the AAA inspector. Rather, the letter alleged that the Flotel discriminated against him when he was reprimanded for mumbling as a result of the AAA inspector's report, attributing this criticism to his "accent and national origin." *Id.* More generally, Parra insisted that the allegations were inconsistent with his superior service to the Hotel and its guests. He suggested, however, that the Hotel was retaliating against him for participating in a 2002 lawsuit brought by employees against the Hotel for charging guests an 18% gratuity for room-service orders while remitting only 15% to the waitstaff. *See Fernandez v. Four Seasons Hotels, Ltd.,* Case No. 024689F, 2007 WL 2705723 (Mass.Super.2007). Parra was a class-member and received a settlement as a result of the suit, but did not otherwise take any significant part in the litigation. Def.'s Stat. of Material Facts ¶ 21; Parra Dep. at 174–75

(document # 44–4). He does not indicate whether the named plaintiffs were retaliated against or offer evidence of other class-members' subsequent treatment.

Parra alleges that Ms. Eldemery refused to perform an investigation into the complaints of discrimination lodged in his letter. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 31. Parra also alleges, on the one hand, that Ms. Eldemery never met with him to discuss his discrimination complaint but, on the other, claims that she did not make a note of their conversation and, instead, "simply dismissed the complaint out of hand." *Id.* From these allegations, it is unclear whether Parra claims that Ms. Eldemery did not meet with him, or instead concedes that she did meet with him but complains that she did not take any investigative action as a result of their meeting.

Ms. Eldemery, however, states that she first spoke to Parra regarding his letter via telephone on August 22, 2003, to let him know that she would like to speak with him in-person when he returned from suspension. Eldemery Dep. 40:17–18 (document # 44–8). She says she met with Parra when she returned from vacation, on approximately September 2, 2003, to discuss his letter. *Id.* at 40:23. According to Ms. Eldemery, she felt that she was able to resolve the issue with Parra during this meeting and that they were able to agree that the letter "was not a discrimination claim, but merely a grievance complaint based on a written warning that he had received and subsequently a suspension that he had received based on two different performance issues." *Id.* at 41:13–18.

Upon returning from his five-day suspension, Parra again met with Mr. Kennel, Mr. Stampfer, and Mr. Gomes, who wanted to be sure that Parra understood why he had been suspended and to ensure he returned to his position with positive feel-

ings. Def.'s Stat. of Material Facts ¶ 29. Mr. Kennel states that such meetings are protocol when an employee is returning from suspension. Kennel Dep. 16:12–20 (document # 44–6). Parra alleges that he was again refused access to the AAA report at this meeting. *Id.* The Hotel claims that Parra was once again insubordinate and rude. As a result, Mr. Kennel suspended Parra for one additional day, after which he returned to work. Def.'s Stat. of Material Facts ¶ 29.

Shortly afterwards, however, on September 11, 2003, Parra was suspended for two days for an outburst related to an order that was delivered late to a room. Def.'s Stat. of Material Facts ¶ 32: Eldemery Dep. 43:6–9. Ms. Eldemery testified that Parra's manager, John Gomes, had come to her regarding this incident and told her that there was an order delivered late to a guest's room, that he questioned Parra about it, and that Parra became extremely defensive and unreasonable. *Id.* at 44:4–12. Ms. Eldemery met with Parra regarding this incident and reported that Parra again became defensive, made excuses for why the order was delivered late, and would not accept responsibility for the error. *Id.* at 45:16–24. As a result, Parra was again suspended—this time for two days. *Id.* at 43:6–9. Additionally, Ms. Eldemery testified that she warned Parra that "any further incidents" could result in his termination, that "whether something happens today, tomorrow, six months from now, a year from now, this [was his] last opportunity." *Id.* at 46:13–21. Ms. Eldemery memorialized the content of the meeting, as well as her warning to Parra in a letter, which Parra signed. Eldemery Letter 9/11/03 (document # 44–32).

Parra, for his part, alleges that he told Ms. Eldemery that there had been no outburst or insubordination on his part about the late delivery but that Ms. Eldemery stated she believed Mr. Gomes' account, despite the fact that Human Resources knew Mr. Gomes was an abusive and "troubled manager." Pl.'s Stat. of Material Facts ¶ 32; Memos re: Gomes (document # 44–35) (Mr. Gomes was told many times by Hotel management that he needed to improve his treatment of his staff, and was eventually encouraged to seek employment outside of the Hotel). Parra further alleges that the letter issued to him by Ms. Eldemery, which he signed, was in retaliation for his original letter alleging discrimination. Pl.'s Stat. of Material Facts ¶ 32.

### C. Parra's Termination

The event capping this employment dispute occurred on April 25, 2004, when a guest staying in the Presidential Suite reported to Hotel management that he emerged from his bathroom to find Parra sitting on a couch in the suite. Def.'s Stat. of Material Facts ¶ 33; Eldemery Dep. 48:5–14. According to both the Hotel and Parra, he was sent to the suite to remove a room-service table. Def.'s Stat. of Material Facts ¶ 33; Pl.'s Stat. of Material Facts ¶ 33. Parra, however, alleges that he and a housekeeper rang the doorbell to the suite several times and when they did not receive a response, the housekeeper used her key to enter the room. Parra Dep. at 160 (document # 44–5). Once inside the room, Parra testified that he sat down on a chair because he was not feeling well, due to the medication he was on at the time for depression and the stress he was experiencing as a result of the Hotel's treatment. *Id.* at 160:14–17. At this point, the guest came out of the bathroom to see Parra sitting down in the living room. Parra states that he simply said "Good Morning, Mr. Healey," then got up and left the room with the housekeeper. *Id.* at 161:7–16. Nonetheless, the guest telephoned Hotel

management and complained about the incident.

When approached by Mr. Gomes, Parra concedes that he initially denied any wrong-doing on his part, out of embarrassment and fear of reprisal based on his experience with the AAA inspection. *Id.* at 62:8–14. Ms. Eldemery was then called to speak with Parra about the incident. She testified that Parra admitted to sitting down in the guest room during their face-to-face meeting and recognized that he should not have lied initially about what had happened. Eldemery Dep. 49:14–20. Parra was then suspended until the Hotel could complete an investigation. *Id.* at 50:2–3. Ms. Eldemery reviewed Parra's file, consulted with management and the Vice President of Human Resources for North America, and ultimately recommended that Parra be terminated. *Id.* at 50:2–9. Ms. Eldemery testified that she was unaware of any other employees terminated for sitting in a guest room, but that Parra's initial dishonesty, as well as the warning letter issued to him on September 11, 2003, played a role in the decision to terminate him. *Id.* at 52:5–13, 53:6–9.

## III. PROCEDURAL HISTORY

Shortly after his termination, Parra filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), alleging that the Four Seasons Hotel discriminated against him based on his "age, race, color, and national origin." Pl.'s Stat. of Material Facts ¶ 13. Parra later clarified his claims in a letter to the MCAD investigator, in which his attorney stated that "any critical reference contained in the [AAA] Inspector's Report regarding Parra's English articulation and used as grounds for a negative employment decision would be facially improper." Pl.'s Letter to MCAD (document # 46-4).

During its investigation, MCAD requested documentation from the Hotel about its disciplinary practices during the relevant time period. The parties dispute, however, whether MCAD sought information about other employees who had been disciplined for errors during the 2003 AAA inspection or documentation from the Hotel regarding other employees who had been disciplined for carelessness during 2003 and 2004 (the infraction Parra was most commonly cited for). Pl.'s Stat. of Material Facts ¶ 14; Def.'s Resp. to Pl.'s Stat. of Material Facts ¶ 15 (document # 46). Whichever request was made, the Hotel subsequently provided MCAD with a spreadsheet of employees who had been disciplined for carelessness during 2003 and 2004; however, the Hotel prefaced this submission with a cover letter incorrectly stating that the spreadsheet reflected employees disciplined for errors occurring during the 2003 AAA inspection. Def.'s Letters and Enclosures to MCAD at 1 (document # 38-8). The Hotel subsequently realized this error and corrected itself in filings before this Court. Def.'s Resp. to Pl.'s Stat. of Material Facts ¶¶ 15, 16.

After its investigation, MCAD dismissed Parra's complaint, finding that he had not provided the Commission with enough evidence that the Four Seasons had discriminated against him on the basis of age, race, color, or national origin. MCAD Dismissal (document # 38-9). Parra alleges that the mislabeled spreadsheet provided "evidentiary support" for the adverse MCAD investigative finding because it allowed the agency to determine that the Hotel disciplined multiple employees as a result of the AAA inspection. Pl.'s Stat. of Material Facts ¶ 17. By contrast, the Hotel argues that a "fair reading of the MCAD Memorandum reflects that the MCAD considered a number of facts in reaching its decision, including Parra's receipt of nu-

merous disciplinary warnings and suspensions." Def.'s Resp. to Pl.'s Stat. of Material Facts ¶ 17 (document # 46). *See* MCAD Dismissal at 1.

After MCAD dismissed his complaint, Parra filed the instant action, alleging discrimination on the basis of age, race, and national origin under Title VII, the ADEA, and Mass. Gen. L. ch. 151B. Second Am. Compl. (document # 18). He also brings pendent state claims for bad faith termination of employment, both negligent and intentional infliction of emotional distress, and violation of an implied covenant of good faith and fair-dealing. *Id.* at 6.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

■ Plaintiff has submitted a Motion for Summary Judgment arguing that he is entitled to judgment because the Hotel supplied "false and erroneous information" to both MCAD and the Court itself. Pl.'s S.J. Mem. at 7–8. Parra alleges that the Four Seasons made fraudulent misrepresentations to MCAD when, in a cover letter, the Hotel inaccurately characterized a spreadsheet showing the Flotel employees who, like Parra, were disciplined for carelessness in 2003 and 2004. Instead, the Hotel stated in its cover letter that the spreadsheet documented the employees disciplined as a result of the 2003 AAA inspection. *Id.* at 8–9.

In addition, Parra claims that the job description and Code of Conduct submitted by the Four Seasons to MCAD are evidence that the "defendant intended to deceive the Commission." *Id.* at 9. According to Parra, the job description for a "server overnight," dated September 1, 1998, would not have been applicable to him because such a document was only given to new employees during their orientation. By contrast, older employees like Parra whose "employment long pre-dated

the document" would not have received the specific job description provided. *Id.* at 7; Eldemery Dep. 58:23–24, 59:1–9. Much the same, Parra attacks the Code of Conduct submitted by the Four Seasons because the document was revised on August 25, 2004, a year after the July 2003 AAA inspection took place. As a result, this Code of Conduct was inapplicable at the time Parra allegedly provided poor service to the AAA inspector. Pl.'s S.J. Mem. at 7; Four Seasons Core Standards North America City at 2 (document # 38–8). The plaintiff argues that these errors and inconsistencies together entitle him to summary judgment apart from the substance and merits of his discrimination claims.

Although Parra offers little direct authority for this short-cut to summary judgment, he invokes the "inherent powers" of the Court and appears to rely in part on Rule 60(b), which allows the Court to relieve a party "from a final judgment, order, or proceeding" in cases of "fraud ..., misrepresentation, or misconduct by an opposing party." Fed.R.Civ.P. 60(b)(3); *see* Pl's S.J. Mem. at 10 (citing *Karak v. Bursaw Oil Corp.,* 288 F.3d 15, 21 (1st Cir.2002) (construing Rule 60(b)); *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir.1988) (same)). Plaintiff contends that the above misrepresentations played a role in the MCAD's dismissal of his discrimination complaint, and that the Hotel has sought to commit the same fraud before this Court by attempting to "use the finding of the MCAD as an affirmative defense." Pl.'s S.J. Mem. at 10. On this basis, he urges the Court to find that the Hotel's litigation conduct "foreclosed [Parra] from a full and fair presentation of his case before the MCAD" and, therefore, that he is entitled to summary judgment. *Id.*

While Rule 60(b) could conceivably offer some authority for invalidating the MCAD and EEOC determinations that found Parra's claims meritless, the Rule nowhere suggests that it supplies an independent basis for summary judgment. *See* Fed. R.Civ.P. 60(b) (governing relief from "a final judgment, order, or proceeding"). Even if these alleged misrepresentations affect the credibility of the agency findings, Rule 60(b) does not relieve Parra from proving the merits of his discrimination claim in this Court. The cases that Parra cites are not to the contrary. In *Premier Homes v. Cheswell, Inc.,* the Court relied on its inherent powers to enter judgment based on one party's litigation misconduct—but only where it found that the plaintiff, the very party that initiated the suit, had abused the judicial process by fabricating computer records in support of its claim. 240 F.Supp.2d 97, 99 (D.Mass.2002). The court noted that it is "elementary that a federal district court possesses the inherent power to deny the court's processes to one who defies the judicial system by committing a fraud on the court." *Id.* (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir. 1989)). In this case, by contrast, it is Parra who has sought to avail himself of the judicial process, hailing the Hotel into court to defend against his claims of discrimination. Under these circumstances, Rule 11—a motion for sanctions—is the appropriate remedy for any alleged misrepresentation by the Hotel, not summary judgment. *See* Fed.R.Civ.P. 11(c).

Even if *Premier Homes* were applicable in this litigation posture, its measure of misconduct has not been met. A fraud on the court occurs, as the First Circuit has stated, "where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adju-

dicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude,* 892 F.2d at 1118. Nothing in this case remotely fits that standard. Any close examination of the disputed spreadsheet shows that it contains those Hotel employees cited for "carelessness" in 2003 and 2004, whatever inaccurate description appeared in the cover letter that accompanied these materials. Def.'s Letters and Enclosures to MCAD at 1. This fact is consistent with the affidavit submitted by Maile Gilmore, the Hotel's legal counsel during the MCAD investigation, which acknowledges that he mistakenly wrote that the spreadsheet listed employees who were disciplined as a result of the 2003 AAA inspection, rather than those who had been warned for carelessness in 2003 and 2004. Gilmore Decl. ¶ 6 (document # 46–2). Indeed, Parra does not contend that the spreadsheet data itself was manufactured, only that the Commission was confused by the cover letter's faulty description. Altogether, the MCAD submissions suggest that the spreadsheet was mislabeled, not that the Hotel sought to mislead either agency—and certainly not that it "sentiently set in motion some unconscionable scheme." *Aoude,* 892 F.2d at 1118.

In any event, MCAD did not rely solely on the mislabeled spreadsheet in rejecting the plaintiff's discrimination claims. The Commission's investigator noted that the plaintiff had a series of disciplinary citations for "inappropriate behavior and poor attitude" and "was made aware through written warnings [that the Hotel] would not tolerate his behavior and further incidents would result in possible termination." MCAD Dismissal at 1–2. MCAD ultimately found that Parra had "failed to provide the Commission with evidence to substantiate his allegations that the actions

taken against him were based on his age and race and color." *Id.* Quite apart from the spreadsheet, the MCAD investigation apparently concluded that Parra had not presented affirmative evidence of discrimination. *See also* EEOC Dismissal (document # 38–10).

Finally, the Court notes that no misrepresentations have been shown before the district court, whatever misconceptions were held by MCAD or the EEOC. The Hotel has admitted in the Gilmore Declaration that the spreadsheet's cover letter did not accurately reflect the document's contents and it has corrected any misimpression. Gilmore Decl. ¶ 6. Thus, there has been no fraud perpetrated on this Court. Whether MCAD was misled by a genuine mistake or more deliberate inaccuracy, this Court's very task is to determine whether Parra has offered sufficient facts to support his claims of discrimination before a jury. Under these circumstances, Parra's Motion for Summary Judgment based on the Hotel's MCAD submissions is **DENIED;** the Court shall proceed to consider the merits of his discrimination claim.

## V. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Four Seasons has also moved for summary judgment, arguing that Parra has failed to raise any genuine issue of material fact that would support his claims before a jury. Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Uncle Henry's, Inc. v. Plaut Consulting Co.,* 399 F.3d 33, 41 (1st Cir.2005) (quoting Fed. R. Civ. Pro. 56(c)). The burden is on the moving party to show

that no material fact is in genuine dispute. Such a dispute exists where the evidence with respect to disputed fact "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To rebut this showing and avoid summary judgment, the non-moving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R. Civ. Pro. 56(e)); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reaching its decision, the Court views the record in the light most favorable to the non-moving party and it takes all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). Altogether, the Court must determine if the record, taken as a whole, could allow a rational trier of fact to find that the Four Seasons discriminated against Parra on the basis of race, national origin, or age.

### A. Title VII Standard

■ In the absence of direct evidence of discrimination or retaliation, as here, the First Circuit employs the three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas. See Prescott v. Higgins,* 538 F.3d 32, 40 (1st Cir.2008) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see also Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40 (1st Cir.2002); *Woods v. Friction Materials, Inc.,* 30 F.3d 255 (1st Cir.1994). This framework requires that a plaintiff first establish a prima facie case of discrimination by showing that (1) he belongs to a protected class, (2) he met his employer's expectations, (3) the employer took an adverse action against him, and (4) either

that someone with similar qualifications took over his responsibilities or that the employer searched for someone with similar qualifications to fill the position. *Santiago–Ramos,* 217 F.3d at 54 (citing *Smith v. Morse & Co.,* 76 F.3d 413, 421 (1st Cir.1996)).

Once this showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the disputed employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer supplies such an explanation, the burden shifts back to the plaintiff to demonstrate that the employer's proffered rationale is pretextual and permits the inference of a discriminatory purpose. *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 536 (1st Cir.1996). Importantly, under *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), plaintiffs are no longer required to establish both pretext and discriminatory intent; rather, a jury can infer discriminatory intent if a plaintiff has made out a prima facie case and has provided strong and "sufficient evidence to find that the employer's asserted justification is false." *Id.* at 148, 120 S.Ct. 2097 (noting that an employer could be entitled to judgment as a matter of law "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue"). This same framework also applies to plaintiff's Chapter 151B discrimination claims. *See Prescott,* 538 F.3d at 40.

At the summary judgment stage, the First Circuit has held that courts can forgo the burden-shifting framework and look instead to whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus. *See Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 535–36 (1st Cir. 1996). Here, the court of appeals has cautioned against granting summary judgment for the employer when a plaintiff "makes out a prima facie case and the issue becomes whether the employer's stated non-discriminatory reason is a pretext for discrimination." *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 167 (1st Cir.1998); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 12 (1st Cir.1994). Nonetheless, the First Circuit has also stated that "summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003); *see also Fennell,* 83 F.3d at 536 (affirming summary judgment where plaintiff was left with only "conjecture and innuendo" that her termination was an act of retaliation).

## B. Parra's Discrimination Claims

### 1. Plaintiff's Prima Facie Case

As an initial matter, the burden-shifting analysis requires Parra to establish a prima facie case of discrimination based on the factors identified above. It is undisputed that Parra is a member of a protected class: he is Hispanic, having been born in Mexico, and was over 40 at the time he was terminated. Likewise, Parra undoubtedly suffered an adverse employment action as the result of his termination. The Hotel argues, however, that Parra fails to satisfy the remaining two requirements. According to the defendant, Parra "has not shown that he met Four Season's legitimate job performance expectations at the time he was discharged;" it further avers that Parra was replaced by a Hispanic male over the age of 40, a member of the same protected classes. Def.'s S.J. Mem. at 8, 14; Def.'s Statement of Material Facts ¶ 39.

■ The Hotel recognizes, as does this Court, that the mere fact that Parra cannot show he was replaced by someone outside his protected classes does not defeat his prima facie case. *See Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 155 (1st Cir.1990); *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1335 n. 2 (1st Cir.1988) ("replacement by a younger person ... is not an element of the plaintiff's prima facie case in an ADEA suit."). This fact may carry "evidentiary force" when the Court considers whether Parra has offered sufficient evidence of pretext, but it does not pose an obstacle at this stage of the *McDonnell Douglas* analysis. *Cumpiano,* 902 F.2d at 155.

The issue of Parra's job performance raises a closer question and captures, at bottom, the essential issue in this litigation. The Hotel claims that it fired Parra precisely because of his unsatisfactory job performance in the period following the AAA inspector's visit, citing a pattern of behavior which resulted in his temporary suspensions in 2003 and culminated with his dismissal on the basis of a guest complaint in April 2004. Parra counters that the entire ordeal, beginning with the AAA inspection, was a prolonged effort to terminate him inspired by discriminatory animus.

■ Prior to this period, however, there is little disagreement that Parra was a loyal and satisfactory employee of the Hotel, having worked there for some 18 years. While it is true that from 1988 to 2001 Parra received 10 notices of unsatisfactory performance—for reasons ranging from careless room-service deliveries to interpersonal issues with management and co-workers—nothing indicates that the Hotel ever considered these citations so serious as to put his job in jeopardy.[1] Def.'s Stat. of Material Facts ¶ 9–22. In fact, Parra often received praise from management over the course of his tenure at the Four Seasons. Despite intermittent concerns about his receptivity to criticism, management consistently rated Parra as "service oriented" and even declared that he "truly is able to do what Four Seasons hopes all its employees will be able to accomplish." *See, e.g.,* Employment Review 11/3/97 (document # 44–10). Where the plaintiff has shown that his job performance was satisfactory prior to the very events in dispute, the Court considers this factor met for the purposes of establishing a prima facie case. *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir. 2003) (holding that the employee's initial burden "is not an onerous one") (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Whether Parra's job performance was unsatisfactory during the disputed period—or whether these allegations are mere pretext—is a question more properly addressed at the subsequent steps of the *McDonnell Douglas* analysis.

### 2. Defendant's Legitimate, Non–Discriminatory Rationale

The Hotel states that it fired Parra after a guest complained that he found Parra sitting in his room, the Presidential Suite, in April 2004. The defendant alleges, and Parra does not disagree, that he initially lied about sitting in the guest's room when approached by management about the complaint. *See* Eldemery Dep. 49:14–20. This incident, the Hotel says, was the culmination of many warnings and

---

**1.** Parra disputes the nature and content of many of these citations. In some circumstances, Parra even refused to sign the written warning issued by management because he disagreed with management's perception of what had occurred. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶¶ 9–22.

disciplinary issues over the previous nine months, including citations and suspensions for carelessness, insubordination, rudeness, lack of cooperation, and frustration under stress. In particular, the Hotel points out that it had warned Parra in September 2003, after his suspensions, that any further disciplinary issues would not be tolerated and could lead to his immediate termination. *See* Def.'s S.J. Mem. at 8; Eldemery Letter 9/11/03 (document # 44–32). Reaching even further into the past, the Hotel identifies 10 prior notices of unsatisfactory performance, described above, which foreshadowed the conflicts that arose after the AAA inspection. Def.'s Stat. of Material Facts ¶¶ 9–22. Several of these citations are consistent with performance evaluations from 2001 to 2003 that urged Parra to be "more objective and calm" in stressful situations and when receiving criticism from supervisors. *Id.* at ¶ 19–20, 23.

■ The Court finds that the Hotel's explanation satisfies its burden of proffering a legitimate, non-discriminatory rationale for Parra's termination. *See, e.g., Garcia v. Bristol–Myers Squibb Co.,* 535 F.3d 23, 31 (1st Cir.2008) ("BMS has identified a legitimate, non-discriminatory reason for firing Garcia: her deficient performance."); *Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 100 (1st Cir. 2007). In essence, the Hotel argues that it fired Parra at the end of a long-running and amply documented conflict with management, at a point when it concluded that his performance and interpersonal difficulties were a liability to the company. It is up to Parra to show that this explanation is pretextual, such that a jury could find that it conceals a discriminatory reason for his termination.

### 3. Pretext and Discriminatory Motive

■ Since the Supreme Court's decision in *Reeves v. Sanderson Plumbing*

*Products, Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), evidence tending to show that the defendant's proffered reason is false, together with the plaintiff's prima facie case of discrimination, can be sufficient for a jury to infer discriminatory intent on the part of the employer. *Id.* ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 72 (1st Cir.2004). In short, plaintiffs are no longer required to show both pretext and animus to avoid summary judgment. Instead, evidence that a defendant's proffered reason is false or manufactured may be enough, by itself, to support a jury's inference of discriminatory motive.

■ At the same time, however, *Reeves* cautioned that proof of pretext would not always be enough to reach a jury. "For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148, 120 S.Ct. 2097. Where the plaintiff's facts will not support an inference of discrimination, judgment for the employer is warranted. Altogether, "[a]t summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age" or race. *Dávila v. Corporación De Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 16 (1st Cir. 2007). In Parra's case, he has failed to meet even this generous threshold.

■ Parra's allegations of discrimination boil down to a claim that he was made a scapegoat for the AAA inspector's poor review in 2003, based on racial or age bias, and was then disciplined repeatedly over the course of nine months and ultimately fired after complaining about his treatment. He offers no direct evidence of discrimination, apart from the claim that any censure resulting from the AAA inspector's complaint about a "mumbled greeting" amounts to discrimination based on his accent. *See* Pl.'s Opp. to S.J. at 13. At the same time, however, Parra denies altogether that he was the room-service waiter who served the inspector during her visit.[2] It is difficult for the Court to square these two contentions. Even more, the negative review for which Parra was cited involved numerous lapses that had nothing to do with the waiter's speech. *See* AAA Lodging Evaluation Summary (document # 44–39) (identifying the room-service waiter's failure to address the inspector by name, his interest in watching what she had on television in her room rather than serving her, his failure to ask her where she wanted her table set up, his failure to offer to pour her beverage, and his failure to present her with the newspaper that was hanging in her room). Simply put, the inspector's wide-ranging complaint offers only the thinnest reed, if any, on which to stake Parra's allegations of bias.

### a. Comparative Evidence

■ To establish pretext under Title VII in the absence of direct evidence, a plaintiff can offer many different forms of circumstantial evidence. *See Mesnick*, 950

F.2d at 824; *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 72 (1st Cir.2004). Such evidence can include, but is not limited to: discriminatory comments made by key-decision makers, *see Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 85 (1st Cir.2004); comparative evidence showing that the plaintiff was singled out in ways that others were not when they engaged as the same conduct as plaintiff, *see Straughn v. Delta Air Lines*, 250 F.3d 23, 37 (1st Cir.2001); evidence that the employer's reason was developed after the adverse employment action was taken, *see Santiago–Ramos*, 217 F.3d at 56; "the historical background of the adverse employment action decision," *see Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168–69 (1st Cir.1998); and weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons, *see E.C. Waste, Inc. v. N.L.R.B.*, 359 F.3d 36, 44 (1st Cir.2004).

Parra does not offer any persuasive comparative evidence to show that he was treated differently from Hotel employees outside the protected classes. Only one other Hotel employee, an African–American woman in house-keeping, was disciplined as a result of the AAA inspection.[3] *See* McKonnen Notice of Unsatisfactory Performance (document # 38–16). But as the spreadsheet shows, a large number of employees—both white and minority—were disciplined for "carelessness" during 2003 and 2004, the infraction for which Parra was initially cited after the ill-fated AAA review. *See* Letters and Enclosures to MCAD (document # 38–8). This citation was directly tied to the inspector's wide-ranging complaint about the room

---

**2.** The Court does not have direct evidence of the inspector's identification of Parra, only the account offered by the Hotel management. This testimonial evidence, however, serves a non-hearsay purpose: it shows what

the Hotel believed at the time of the review, whether or not the inspector's identification was accurate.

**3.** She was reassigned to different duties.

service she received and her identification of Parra as the room-service waiter who attended to her. *See* AAA Lodging Evaluation Summary. Moreover, neither Parra nor his counterpart was fired as a result of the inspection; Parra himself was not terminated for another nine months, after the resulting conflict with management proved seemingly intractable.

Nonetheless, Parra argues that the Hotel deviated from its normal practices and procedures, suggesting discrimination, when it allegedly punished him multiple times for the same infraction, issued an open-ended warning, and ultimately terminated him for sitting in a guest's room. None of these comparisons are availing on the record. The Hotel states that it did not suspend Parra for five days and then later for another day because of the AAA inspection, but rather due to Parra's repeated resistance to management attempts to address the negative review. Def.'s Resp. to Pl.'s Stat. of Facts ¶ 10; Eldemery Dep. at 32–36. Indeed, the reasons listed for Parra's suspensions on the disciplinary action forms that accompanied these suspensions were insubordination, non-cooperation, rudeness, and refusal to take responsibility. *See* Notice of Unsatisfactory Performance 8/21/03 (document # 44–27); Notice of Unsatisfactory Performance 8/28/03 (document # 44–28). The deposition testimony, describing Parra's repeated refusal to engage constructively with his supervisors, is consistent with this documentary proof. *See* Kennel Dep. 12:19–23, 15:12–19 (document # 44–6); Def.'s Stat. of Material Facts ¶ 29. Indeed, this interpersonal difficulty is borne out in several of the performance notices and evaluations that long-preceded these events, wherein Parra was urged to improve his receptivity to criticism. *See* Employment Review 11/97 (document # 44–11); Employment Review 11/98 (document # 44–12); Employment Review 04/01 (document # 44–13); Employment Review 05/03 (document # 44–15).

Much the same, Parra protests that the disciplinary warning subsequently issued by management broke with Hotel policy because it did not expire after six months, as with other such notices, but operated as an open-ended warning that he could be fired for any future infraction. *See* Eldemery Letter 9/11/03. Ms. Eldemery testified that the standard six-month probation period was a matter of general practice, not official Hotel policy, and Parra does not point to any convincing evidence to the contrary. Eldemery Dep. 13:6–12. Under the circumstances, where Parra had already received three suspensions, the open-ended warning does not appear disproportionate or pretextual. In fact, one might just as easily conclude that the Hotel went to some length to retain Parra, a loyal and experienced employee of nearly twenty years, despite the repeated conflicts with management. *See* Eldemery Letter 9/11/03; Eldemery Dep. 31–:15–22 (noting that insubordination is considered a category one offense, for which Hotel employees can be terminated immediately). When he was ultimately terminated for sitting in a guest's room and lying to his supervisor in April 2004, Parra had had a number of second-chances. Although Ms. Eldemery stated that she did not know of any other Hotel employee fired for sitting in a guest's room, Parra was warned in September 2003 that any future incident could result in his immediate dismissal. Pl.'s Resp. to Def.'s Stat. of Mat. Facts ¶ 34. His unusual disciplinary record amply accounts for the unusual circumstances of his termination.

Most importantly, Parra can point to no other non-minority employee with a comparable disciplinary record who was treated differently than he was. *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 76 (1st

Cir.2004) ("[I]t is the plaintiff's burden to demonstrate that she is comparing apples to apples.") (citing *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996)). While it is certainly not necessary for a plaintiff to offer comparative evidence to show bias, its absence here is consistent with Parra's general lack of proof of bias. *See Rathbun*, 361 F.3d at 72 ("many veins of circumstantial evidence ... may be mined. These include—but are by no means limited to—evidence of differential treatment, evidence of discriminatory comments, statistical evidence, and comparative evidence.") (quoting *Mesnick*, 950 F.2d at 824); *cf. Ortiz Garcia v. Toledo Fernandez*, 405 F.3d 21, 24–25 (1st Cir.2005) (per curiam) (rejecting political discrimination claim in the absence of "competent comparative evidence suggesting political animus").

### b. Weaknesses, Implausibility, and Contradictions

■ To make his pretextual showing, Parra relies almost exclusively on one category of evidence, alleging weaknesses, implausibilities, and contradictions in the Hotel's proffered reason for disciplining and then terminating him. *See* Pl.'s Supp. Opp. to S.J. at 1 (document # 47); *Santiago–Ramos*, 217 F.3d at 56; *see also Hospital Cristo Redentor, Inc. v. N.L.R.B.*, 488 F.3d 513, 524 (1st Cir.2007) (citing *E.C. Waste, Inc. v. N.L.R.B.*, 359 F.3d 36, 44 (1st Cir.2004) (holding that "an employer's shifting explanations for discharging an employee may themselves serve either to ground or reinforce a finding of pretext")).

In particular, Parra argues that the following are sufficient to show pretext and support the inference of discriminatory motive: the Hotel's failure to produce any documentary evidence identifying him as the room-service waiter involved in the AAA inspection; the mislabeled spreadsheet submitted to MCAD, discussed above; alleged manipulation of spreadsheet data, showing employees cited for multiple disciplinary actions in different departments of the Hotel on the same day; the Hotel's "ratcheting up" of the guest's complaint into an "unauthorized presence" infraction; and the "post-litigation creation of a 12–year–old robed girl" in the Presidential Suite where Parra was found sitting. Pl.'s Opp. to S.J. at 3–4. These arguments are treated in turn.

The plaintiff spends much of his opposition disputing statements that he was the waiter who served the AAA inspector. But it is far from clear how these denials, even if credited, support his theories of discrimination. Parra notes that the Hotel has never provided written proof of the inspector's identification of him, and that the Hotel offered multiple accounts of how exactly he was identified.[4] *Cf.* June 11, 2008 Order (barring defendant from introducing any evidence at trial not timely disclosed to plaintiff, including documents relating to the inspection). At the same time, however, Parra himself has been inconsistent on this issue. Both sides agree that Parra initially denied he was the room-service waiter responsible, but the Hotel states that Parra later admitted his

---

4. In its Responses to Plaintiff's Second Interrogatories, the Hotel stated that "[t]he AAA inspector identified Mr. Parra by name during a conversation with hotel manager Thierry Kennel. In particular, [she] identified Mr. Parra based on his name tag. Based on the schedule for that day, hotel management also believed that Mr. Parra had been the server responsible." Def.'s Answers to Interrogatories (document # 38–13). Mr. Kennel testified at his deposition, however, that the AAA inspector had written down Parra's name, based on his name tag, but could not remember it when she met with management. Instead, they browsed employee photographs on the Hotel's computer system where she identified Parra as her room-service waiter. Kennel Dep. 12:1–14 (document # 44–6).

involvement when he met with management. Def.'s Stat. of Material Facts ¶ 27; Decl. of Ranier Stampfer ¶ 7 (document # 42–9). Perhaps most tellingly, the letter that Parra sent to Human Resources during his first suspension, complaining about his treatment and alleging discrimination, did not deny that he was the room-service waiter involved, only that his service was consistently better than that described in the review. Parra Letter 8/22/03 (document # 44–31). This record, roughly contemporaneous with the disciplinary incidents at issue, undercuts Parra's attempt to portray himself as an uninvolved scapegoat.

Even if the AAA inspector in fact misidentified Parra as her room-service waiter, this error would not support a claim for discrimination. *See Kouvchinov v. Parametric Technology Corp.*, 537 F.3d 62, 67 (1st Cir.2008) ("[I]t is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception."). The fact that the Hotel disciplined the wrong employee on the basis of an error or mistake is not the type of personnel decision that Title VII stands to remedy. *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991) ("Courts may not sit as super-personnel departments, assessing the merits—or even rationality—of employers' nondiscriminatory business decisions."). If Parra was disciplined because of an accidental or good faith misidentification, this Court can offer him no relief.

Parra's theory, instead, must be that Hotel management purposefully chose to pin the blame on him—as opposed to the server actually at fault—based on his race,

age, or national origin.[5] This theory is belied by the fact that, for the shift in question, the room-service department was staffed by five Hispanic men, three Haitian men, and one North African man. *See* Pl's Resp. to Def.'s Statement of Facts ¶ 21. Notably, every one of these waiters belonged to a protected class. As a result, it is not possible to infer that Parra was made a scapegoat in the place of a white employee. Parra points to no statements by anyone at the Hotel, either before or after these events, that suggest race, color, or national origin played a role in his treatment.

Nor does the wider record reveal any foundation for inferring age discrimination as a basis for the conflict arising from the AAA inspection. The only evidence Parra has submitted suggesting such bias is comments by two banquet waiters he worked with, neither of whom held management positions or had any influence on personnel decisions. *See* Parra Dep. at 58–66 (document # 44–5); *Bennett v. Saint–Gobain Corp.*, 507 F.3d 23, 31 (1st Cir.2007) ("[T]he discriminatory intent of which a plaintiff complains must be traceable to the person or persons who made the decision to fire him."). Parra does not even specify whether these comments were made before or after the AAA inspection in July 2003. *See* Parra Dep. at 59 (stating that the banquet waiters' comments were made in 2003 or 2004). In either case, he reports that he raised his concerns with a manager, Paul Newman, who agreed that the comments were inappropriate and promised to speak with the

---

5. Parra separately suggests that the Hotel deliberately chose to blame him for the negative review as retaliation for his participation in a class-action lawsuit over employee tips. That litigation involved only wage claims; it was not a discrimination lawsuit and Parra's involvement appears to have been minimal. *Fernandez v. Four Seasons Hotels, Ltd.*, Case No. 024689F, 2007 WL 2705723 (Mass.Super.2007) (bringing claims under Mass. Gen. L. ch. 149, § 152A). This theory—which is not truly a discrimination claim at all—is addressed, and rejected, below.

other employees. After Parra's conversation with Newman, the comments were never repeated. *Id.* at 65. Ultimately, Parra was replaced by a younger employee, but even this fact only thinly supports an inference of age discrimination—he was replaced by another Hispanic man who was then 45 years-old, only 12 years Parra's junior. All in all, the alleged inconsistencies and contradictions regarding Parra's role in the AAA inspection do not amount to much that would support a claim for discrimination.

Parra next cites the spreadsheet cover letter and data to make his case for weaknesses and contradictions showing pretext. As related above, by all appearances the Hotel's inaccurate cover letter was a genuine mistake, readily apparent from any close examination of the attached spreadsheet. Parra further protests, however, that the data therein was designed to mislead, and thus supports his discrimination claim, because a number of employee citations related to carelessness appear more than once on the list. The Hotel responds that when it generated the spreadsheet, the software used to track employee activities logged duplicate entries for employees who had been transferred to another department or promoted while at the Hotel. Def.'s Resp. to Pl.'s Supp. Mem. at 2 (document # 50); Eldemery Decl. ¶ 5 (document # 50–2). Thus, if an employee had worked as a room-service waiter and subsequently transferred to the banquets department, any disciplinary warnings he had received up to that point were copied into his folder as a banquets employee. The spreadsheet generated by this system reflects those copied citations, displaying a

number of duplicate entries. *See* MCAD Letter and Enclosures (document # 38–8).

Notably, Parra does not argue that the "true" data demonstrates discrimination—only that these duplicates are evidence of the Hotel's post-hoc attempt to paper over its real reason for firing him. The Court is unpersuaded. The spreadsheet is consistent with the Hotel's description of its software and it has subsequently supplied the Court with figures that eliminate these duplicates. Def.'s Resp. to Pl.'s Supp. Mem. at 2–3 (showing that white employees received 58.5% of warnings for carelessness over the two-year period, while African–American employees received 16.0%, Hispanic employees 13.8%, and Asian–Pacific employees 10.6%). Perhaps most importantly, the alleged distortion of the spreadsheet data has little relation to any discriminatory motive. Parra anecdotally suggests that the duplicate entries artificially inflated the total number of citations received by white employees, but he provides no proof that they inflated the relative proportion of carelessness citations handed out to those employees—the proper measure. In fact, contrary to Parra's claims, a substantial number of minority employees are also listed with duplicate warnings.[6] Viewed together, the duplicate entries for Hotel employees who transferred between departments do not mask a record of disproportionately disciplining minority employees; the distribution of these duplicate citations is all but random.

Finally, Parra points to the circumstances that proximately led to his termination to show inconsistencies and weaknesses in the Hotel's account. He argues

**6.** For instance, Jaime Palva, a Hispanic employee, was initially listed nine times for only three separate infractions because he was employed at the Hotel as a Busser, Food Server, and Food Runner, meaning that each citation appeared in triplicate. ·Similarly, duplicates appear for Kenneth Bowman, Rugales Agamez, Mohamed Shifad, Avinash Nanwani, Gwal Wal Tai, Felipe Paz, Kim Quach, Wai Yan Szaio, Carlos Rosario, and others—all minority employees. *See* MCAD Letter and Enclosures (document # 38–8).

that Ms. Eldemery "ratcheted up" the guest's discovery of him sitting in the Presidential Suite to an "unauthorized presence" infraction in order to justify dismissal. Relatedly, Parra alleges that Ms. Eldemery and Mr. Ioannidis invented the presence of a 12 year-old girl in the suite after the fact, in order to make a minor incident appear all the more serious. *See* Ioannidis Dep. at 21 (document # 44–8). He notes, accurately, that prior to the managers' depositions, this girl was never mentioned in any incident report or court filings. The Court has already addressed, at least in part, Parra's termination for this seemingly minor infraction in light of his previous disciplinary record. Much the same, whatever label the Hotel applied, it is undisputed that Parra was found sitting on the guest's sofa, that the Hotel received a guest complaint about Parra's behavior, that he initially lied about his involvement to his supervisor, and that he had been warned eight months earlier that any further misconduct could lead to his termination. While the girl's disputed presence offers a potential inconsistency, though hardly a clear one, it does not meet the materiality threshold when set against those facts admitted by both parties. Without more, these weaknesses asserted by Parra are simply not enough to support the inference of discrimination before a jury.

The case that Parra primarily relies upon to suggest that these weaknesses and inconsistencies are together enough to reach a jury, *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46 (1st Cir.2000), raised a far different set of facts. There, the First Circuit found that the plaintiff, a woman allegedly fired on account of her pregnancy, had sufficiently supported an inference of pretext where she offered (1) evidence of discriminatory comments made by key decision-makers, including pointed questioning two weeks

before her dismissal; (2) evidence of the company's general atmosphere of discrimination, including repeated doubts about the abilities of women with children; and (3) a variety of distinct weaknesses and inconsistencies in the employer's proffered reasons for her termination, including a back-dated memorandum intended to supply a non-discriminatory rationale for the dismissal. *Id.* at 55–56. By contrast, Parra has offered no evidence of discriminatory statements by decision-makers whatsoever, and a much weaker set of alleged contradictions. At the same time, the evidence supporting the Hotel is markedly more robust; it suggests a pattern of interpersonal difficulties and resistance to criticism in plaintiff's employment both before and after the disputed events. Even viewing the evidence in the light most favorable to Parra, the Court cannot find that he has presented sufficient facts from which a jury could find that the Hotel's "proffered nondiscriminatory reasons for [his] dismissal were pretextual and that the actual reason was discriminatory." *Id.* at 57.

### 4. Retaliation

Parra's retaliation claim is equally unsupported by the record. Proving retaliation, as opposed to discrimination, under Title VII requires that the plaintiff make out a prima facie case by showing that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse job action. *Thompson v. Coca–Cola Company,* 522 F.3d 168, 181 (1st Cir.2008). In order to survive summary judgment, Parra "must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory." *Santiago–Ramos,* 217 F.3d at 57 (quoting *King v.*

*Town of Hanover*, 116 F.3d 965, 968 (1st Cir.1997)).

 Parra offers two theories of retaliation in his case: (1) retaliation for his participation and recovery in the tips class-action lawsuit brought against the Hotel by former and current employees under Mass. Gen. L. ch. 149, § 152A; and (2) retaliation for the discrimination complaint he submitted during his five-day suspension immediately following the AAA inspection. *See Fernandez v. Four Seasons Hotels, Ltd.*, Case No. 024689F, 2007 WL 2705723 (Mass.Super.2007); Parra Letter 8/22/03 (document # 44–31). As an initial matter, Parra's participation in the wage litigation does not constitute a "protected activity" under Title VII because it did not concern discrimination made unlawful by the statute. *See* 42 U.S.C. § 2000e–3(a); *Fantini v. Salem State College*, 557 F.3d 22, 32 (1st Cir.2009) (quoting *Cruz v. Coach Stores Inc.*, 202 F.3d 560, 566 (2d Cir.2000)) ("The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."). Second, even if this tips lawsuit met that threshold, Parra has not provided sufficient evidence to establish a causal link between this activity and the Hotel's disciplinary actions or its eventual decision to terminate his employment. Parra himself concedes that his role in the lawsuit was limited to adding "[his] name to the list" of class-members. Def.'s Stat. of Material Facts ¶ 21; Parra Dep. at 174–75 (document # 44–4). But he alleges, without detail or specificity, that subsequently his managers would "never speak to (him) in the hallways." *Id.* No other proof has been offered. So far as the Court can ascertain, this assertion is no more than speculation an—insufficient foundation to reach a jury. *See Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006) (requiring that the plaintiff offer specific facts to support his claim of pretext and discrimination).

 Parra's second theory of retaliation, while somewhat stronger, ultimately fails for similar reasons. His discrimination complaint certainly constitutes protected activity under Title VII, but he has not shown that it was causally related to the adverse employment actions he suffered. Parra's complaint was submitted after the AAA inspector's negative review, during his five-day suspension, so those earlier events fall outside this theory of retaliation. He suggests, however, that his complaint triggered a cascade of disciplinary actions: an additional one-day suspension, the unrelated two-day suspension in September 2003, the warning letter issued thereafter, and ultimately his termination in April 2004.

Given the scarce evidence suggesting that Parra was made a scapegoat for the AAA review, this retaliation claim is difficult to credit. If the Hotel believed in good faith that Parra was the room-service waiter at fault, as discussed above, his discrimination complaint had little merit at the time; instead, the record evinces a deep breakdown in relations with his supervisors on the heels of the AAA inspection. Much the same, the subsequent disciplinary actions may be traced to Parra's job performance and continuing friction with management. No one disputes the guest complaints that prompted the two-day suspension and later his termination. Rather, as discussed above, Parra complains that the resulting disciplinary actions were disproportionate—outsized punishments for admitted infractions—which he links to his discrimination complaint. Yet these events are far more readily connected to the escalating and repeated conflicts with his supervisors that grew out of the AAA inspection: multiple instances where Parra was reported to be insubordi-

nate and resistant to criticism. *See* Notice of Unsatisfactory Performance 8/21/03; Notice of Unsatisfactory Performance 8/28/03, Eldemery Letter 9/11/03 (document # 44–32). While Parra's managers might have been just as rude and unyielding in the course of these events,[7] such conduct does not amount to discrimination or retaliation, just bad management.

The parties disagree about what actions the Hotel, and Ms. Eldemery specifically, took in response to Parra's discrimination complaint. Parra claims that no investigative action was taken whatsoever; Ms. Eldemery states that she spoke with Parra both on the phone and in-person after receipt of his letter, reaching an understanding that the complaint related to a single job performance incident. Pl.'s Resp. to Def.'s Stat. of Material Facts ¶ 31; Eldemery Dep. 40:17–23. The contents of the letter—which cites only the AAA inspector's citation for "mumbling" as the source of discriminatory conduct— and Ms. Eldemery's handwritten notes support the Hotel's account, reflecting a phone conversation on the very day Parra's complaint was received, in which they agreed to meet in-person. *See* Parra Letter 8/22/03. While the Hotel's response could surely have been more robust and better documented, it does not amount to a failure to investigate wide-ranging claims of discrimination. Nor does it lend credence to the larger theory of retaliation Parra lodges before the Court.

### 5. Chapter 151B Wrongful Termination

 Parra also brings his discrimination claims under the Massachusetts anti-discrimination statute, Mass. Gen. L. ch. 151B. The standard for evaluating such claims is the same as that under Title VII. *Joyal v. Hasbro, Inc.,* 380 F.3d 14, 17 (1st Cir.2004). For the reasons stated above, Parra has not supplied sufficient facts for a reasonable jury to find the Hotel's non-discriminatory explanation pretextual. Therefore, he has also failed to satisfy his burden under Chapter 151B. *See Lewis v. Area II Homecare for Senior Citizens, Inc.,* 397 Mass. 761, 766, 493 N.E.2d 867 (1986) ("The reasons given for a decision may be unsound or even absurd, but if they are not discriminatory and if the plaintiff does not prove they are pretexts, the plaintiff cannot prevail.").

### C. Parra's Pendent State Claims

#### 1. Intentional, Negligent, and Reckless Infliction of Emotional Distress

 In his opposition papers, the plaintiff agrees that his claims for intentional, negligent, and reckless infliction of emotional distress are barred by the Massachusetts Workers' Compensation Act, Mass. Gen. L. ch. 152, § 24. *See Lavalley v. Quebecor World Book Services LLC,* 315 F.Supp.2d 136, 149 (D.Mass.2004); Pl.'s Opp. to S.J. at 19.

#### 2. Violation of Implied Covenant of Good Faith and Fair Dealing

 The plaintiff further argues that the Hotel violated the terms of Parra's employment contract, EmPact, by failing to abide by its provisions concerning equal employment and discrimination. *See* Pl.'s Opp. to S.J. at 20. He supplies no further details about the basis for such a claim, however documents supporting his opposition suggest that the Hotel may have

---

**7.** Shortly after Parra's termination, Room Service Manager John Gomes was himself asked to leave the Hotel and seek alternative employment, following numerous reprimands about his treatment of his staff. *See* Pl.'s Stat. of Material Facts ¶ 32 (document # 44–2); Memos re: Gomes (document # 44–35).

failed to follow its own policies governing the investigation of employee grievances. *See* Four Seasons Policies on Discrimination and Grievances (document # 44–35) (providing that in response to a complaint the Director of Human Resources "will conduct an investigation and hearing," "obtain full and written statements from all parties involved," and "issue a written decision to the employee"); *see also Ayash v. Dana–Farber Cancer Institute*, 443 Mass. 367, 385, 822 N.E.2d 667 (2005) (citing *Birbiglia v. St. Vincent Hosp., Inc.*, 427 Mass. 80, 84, 692 N.E.2d 9 (1998)) (recognizing a claim where at-will employee alleged that hospital had failed to follow its own by-laws before restricting her clinical privileges). The Court notes first that the submitted policies are dated 2007, and thus were not necessarily in effect during the events at issue. *See id.* Secondly, as described above, the Court finds that the Hotel did not discriminate against Parra based on his membership in any protected class; therefore it did not violate its own policies concerning equal employment.

Finally, if the Hotel violated its own employee grievance policies by failing to adequately investigate and document Parra's discrimination complaint, his claim for breach of an implied contractual covenant would still be foreclosed by his failure to allege any compensable loss. *Ayash* itself made this requirement plain: "The only damages to which the plaintiff is entitled are for economic losses suffered as a result of the hospital's failure to provide written notice of her right to a hearing." 443 Mass. at 388, 822 N.E.2d 667. Because she had made no such showing, having otherwise received all sums due for her employment, the plaintiff in *Ayash* could not support a claim for breach of the implied covenant of good faith. "[I]n awarding damages for breach of the implied covenant of good faith and fair dealing, the goal is to compensate an employee for past services and to deny the employer 'any readily definable, financial windfall' resulting from the breach." *Id.* (quoting *McCone v. New England Tel. & Tel. Co.*, 393 Mass. 231, 234, 471 N.E.2d 47 (1984)). Parra, too, has failed to identify any economic loss related to the services he performed for the Hotel, where his employment was otherwise terminable for good cause. *See Gram v. Liberty Mut. Ins. Co.*, 391 Mass. 333, 334–335, 461 N.E.2d 796 (1984) (*"Gram II"*) ("We must be careful not to approach allowance of contract damages as if Gram had a contract for life or for a term of years."). Unable to show that he was deprived of an economic benefit owed to him, Parra cannot prove a claim for breach of the implied covenant of good faith and fair dealing.

## VI. CONCLUSION

For the reasons stated herein, the plaintiff's Motion for Summary Judgment (document # 37) is **DENIED** and the defendant's Motion for Summary Judgment (document # 41) is **GRANTED.**

**SO ORDERED.**